**Hand-Delivered**

FILED
CHARLOTTE, NC

JAN 3 1 2025

US DISTRICT COURT
WESTERN DISTRICT OF NC

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**PRISCILLA CANNION,**
Plaintiff,

v.

**WELLS FARGO BANK, N.A.,**
Defendant.

Case No. 3:25-CV-71- FDW

**Complaint for Employment Discrimination**

---

## I. INTRODUCTION

1. Plaintiff, Priscilla Cannion, files this Complaint for Employment Discrimination against Defendant, Wells Fargo Bank, N.A., pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and other applicable federal anti-discrimination laws.

2. This case involves systemic racial discrimination, retaliation, and the creation of a hostile work environment in violation of federal law.

3. The plaintiff seeks relief for the damage caused by the Defendant's unlawful actions, including back pay, emotional distress damage, punitive damages, and any other appropriate legal or equitable relief.

---

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3), as the claims arise under federal law.

5. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the unlawful employment practices were committed in the Western District of North Carolina.

6. Plaintiff received a Right to Sue Letter from the Equal Employment Opportunity Commission (EEOC) on October 29, 2024. The Right to Sue is attached hereto as **Exhibit A**.

7. This Complaint is filed within 90 days of receipt of the Right to Sue Letter.

---

## III. PARTIES

7. Plaintiff, **Priscilla Cannion**, is an African American woman and a resident of Charlotte, North Carolina. At all relevant times, Plaintiff was an employee of Defendant Wells Fargo Bank, N.A.

8. Defendant, **Wells Fargo Bank, N.A.**, is a national banking institution headquartered in San Francisco, California, and conducting business in North Carolina. At all relevant times, Defendant employed over 500 employees.

## IV. FACTUAL ALLEGATIONS

### WELLS FARGO VALUES DIVERSITY AND PROHIBITS DISCRIMINATION AND RETALIATION

Wells Fargo does not discriminate based on race, color, gender, national origin, religion, age, sexual orientation, gender identity, gender expression, genetic information, physical or mental disability, pregnancy, marital status, veteran status, or any other protected class under federal, state, or local law. (Affirmative Action and Equal Employment Opportunity Policy.)

Likewise, Wells Fargo strictly prohibits harassment and takes prompt action to investigate and rectify such behavior. Harassment violates Wells Fargo policy and is not tolerated in the workplace. As such, Wells Fargo expects all employees to assist in preventing discrimination and harassment in the workplace. Wells Fargo instructs employees who learn of harassment or discrimination to immediately report such conduct to the appropriate Employee Relations ("ER") professional who, in turn, will undertake a thorough and objective investigation. (PG 18 Antiharassment and Discrimination Policy.)

Additionally, Wells Fargo is committed to providing an environment and processes to encourage employees to recognize and report—without fear of retaliation—any suspected unethical or illegal conduct, including fraud; securities law or regulatory violations; possible violations of any Wells Fargo policies; or other inappropriate workplace behavior. There is zero tolerance for retaliation against an employee who engages in a protected activity. (Speak Up and Nonretaliation Policy.) Wells Fargo further recognizes it is essential to provide employees with a prompt and thorough review of any work-related concern. To achieve this goal, Wells Fargo offers a plethora of dispute resolution methods and prohibits retaliation against employees who utilize such methods.

Wells Fargo also prioritizes the professional and personal growth of its employees. To advance this priority, Wells Fargo requires managers to provide performance reviews to eligible employees at mid-year and year-end by established due dates. Performance reviews enable managers and employees to discuss key goals, as well as opportunities relative to performance expectations. (Performance Management Overview.)

The above-referenced policies are set forth in the Wells Fargo Global Employee Handbook ("Handbook") available to all employees. At all times relevant to this Charge, Wells Fargo has maintained an online Handbook, which includes Policy summaries and links to Policies and Knowledge Articles, which provide

additional information relating to policy standards and procedures. (**Exhibit: ZZ** Team Member Handbook)

**WELLS FARGO TREATED PRISCILLA M. CANNION IN A DISCRIMINATORY, HOSTAL ENVIRONMENT. IN ADDITION, IN A DISPARATE TREATMENT RETALIATORY MANNER AND DID NOT UPHOLD ITS VERY OWN POLICIES AND PROCEDURES ACCORDING TO THEIR HANDBOOK.**

**A. Disparate Treatment in Training, Work Assignments, and Resources**

9. On or around April 17, 2023, Plaintiff and a non-Black colleague, Yesenia Scott (Hispanic female), began employment as Institutional Investment Operations Specialists at Wells Fargo.  Ms. Scott's LinkedIn Profile Page is attached hereto as **Exhibit B**. Both Plaintiff and Yesenia reported to Michael Marciano, who worked remotely from New York. Plaintiff's Employment Offer Letter is attached hereto as **Exhibit C**.

10. Despite starting on the same day, in the same role, and under the same initial conditions, the Plaintiff was denied equal opportunities, resources, and accommodation afforded to Ms. Scott, creating a stark contrast in their onboarding and overall treatment.

11. First, Plaintiff was required to relocate from Florida to the Charlotte office on April 17, 2023, to begin working onsite immediately. The plaintiff's Employment Offer Letter containing the onsite address is attached as **Exhibit C**. In contrast, Yesenia was approved to work 100% remotely from Florida until May 31, 2023, allowing her to remain in Florida for an additional six weeks while schools in Florida completed their academic year. This preferential treatment granted to Yesenia forced Plaintiff to relocate prematurely, placing undue financial and emotional strain on Plaintiff, who was required to arrange alternative care for her son, remain separated from him during the completion of his high school year leading to graduation, and incur the full costs of relocation without sufficient support.

12. Second, while Plaintiff received no relocation or sign-on bonus as part of her job offer, Yesenia, as well as other non-Black colleagues in the same role, such as William "Bill" Siano and Sarah Stone, received relocation and/or sign-on bonuses. These bonuses provided Yesenia and other non-Black colleagues with significant financial support that Plaintiff was unfairly denied, further exacerbating the financial burdens Plaintiff faced during relocation.

13. Third, after relocating to Charlotte, Plaintiff was not provided with the same access to core systems as Yesenia, which severely limited her ability to perform job-related duties. For example:

   o Yesenia was granted full access to systems such as Alfresco, DTCC, Broadridge, Clearstream, Bancs, and P&L inboxes within two months of starting her role, enabling her to engage directly with the platforms and begin hands-on training.

- In contrast, Plaintiff's access to these core systems was delayed and "trickled in" over several months. By August 2023, Plaintiff still did not have access to all necessary systems. Even by January 2024, Plaintiff continued to face access restrictions that hindered her ability to complete her assignments independently.

14. Fourth, Yesenia was trained directly by Michael Marciano and Sarah Stone (Senior Institutional Investment Operations Specialist with two years of experience), setting her up for success early in her role. Plaintiff, however, was assigned to shadow William "Bill" Siano, the least experienced member of the team, who had only five months of experience in operations and lacked the depth of understanding necessary to provide meaningful training. Bill admitted that he memorized steps

15. without understanding the underlying principles, leaving Plaintiff without adequate guidance or the comprehensive training needed to perform her role effectively.

16. The plaintiff repeatedly raised concerns about the inadequacy of her training, the lack of access to systems, and the inconsistent instructions she received. Despite these efforts to seek assistance and clarification, Plaintiff was met with hostility, dismissal, and retaliatory actions by Michael Marciano, who consistently failed to provide the support Plaintiff required to succeed in her role.

17. The preferential treatment afforded to Yesenia Scott—such as approval to work remotely, financial incentives like relocation bonuses, full system access, and direct training from senior leaders—was denied to Plaintiff, evidencing a pattern of disparate treatment based on race. These inequities created significant barriers for the Plaintiff and contributed to the hostile and discriminatory environment she endured during her employment.

**EEOC Regulation Violated: 42 U.S.C. § 2000e-2(a)(1) - Discrimination in terms, conditions, or privileges of employment based on race.**

- McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)
- Griggs v. Duke Power Co., 401 U.S. 424 (1971)
- Davenport v. N.C. Dept. of Transp., 3 F.3d 89 (4th Cir. 1993)

**2. Disparate Treatment in Work Assignments**

- Patterson v. McLean Credit Union, 491 U.S. 164 (1989)
- Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)
- McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (Again)

**3. Disparate Treatment in Resources (e.g., Tools, Equipment, or Support)**

- Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998)
- Patterson v. Avery Dennison Corp., 281 F.3d 676 (6th Cir. 2002)

- Ward v. UPS, 214 F.3d 707 (6th Cir. 2000)

**4. General Disparate Treatment & Race or Disability Discrimination**

- Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988)
  Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006)
- EEOC v. Waffle House, Inc., 534 U.S. 279 (2002)
  5. Disparate Impact (Optional Approach)
- Griggs v. Duke Power Co., 401 U.S. 424 (1971) (again)

**B. Discrimination in Workplace Assignments**

17. In July 2023, Carlos Gomez (Director of Asset Services/Hispanic male) assigned Plaintiff a regulatory project unrelated to her role. Plaintiff was tasked with observing the training methods of employees in a separate department, rather than receiving training relevant to her job. This diversion further delayed her ability to perform her duties effectively.

18. Plaintiff was frequently assigned to cover for Bill Siano during his absences, despite her lack of training and system access. These assignments were a deliberate attempt to set her up for failure through forced mistakes and undermine her performance.

- **McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)**

- **Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981)**

- **Griggs v. Duke Power Co., 401 U.S. 424 (1971)**

- **Pollard v. E.I. du Pont de Nemours & Co., 532 F.3d 768 (8th Cir. 2008)**

**C. Retaliation for Reporting Discrimination**

19. When Plaintiff attempted to raise concerns about her lack of training and resources, Defendant retaliated against her by imposing unrealistic expectations, documenting alleged performance issues, adding false errors to her completed work, and denying her the promised one-on-one meetings.

20. Michael Marciano weaponized email communication to document Plaintiff's mistakes while failing to provide the coaching or guidance she needed. Despite scheduling recurring one-on-one meetings, Michael consistently canceled these sessions without rescheduling them, further isolating Plaintiff and exacerbating the hostile work environment.

- **Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006)**

- **Staub v. Proctor Hospital, 562 U.S. 411 (2011)**
  **D. Hostile Work Environment**

21. The plaintiff's direct supervisor, Michael, undermined her work, scrutinized her performance disproportionately, and changed or deleted her work to create the appearance of incompetence.

22. In one instance on December 27, 2023, Plaintiff followed Michael's specific instructions on a task. However, by the end of the day, Michael criticized her for completing the task incorrectly, despite her adhering to his guidance. When Plaintiff confronted Michael with evidence that he changed her work to add errors, he abruptly accepted her work without further comment.

23. Plaintiff's workplace injury on November 17, 2023, further compounded her challenges. Despite providing a doctor's note requiring up to six hours of breaks per day, Michael continued to criticize her speed and denied her reasonable accommodations, violating the Americans with Disabilities Act.

- **Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986)**

- **Faragher v. City of Boca Raton, 524 U.S. 775 (1998)**

- **Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993)**

## E. Affirmative Action

24. Wells Fargo did not consider Priscilla M. Cannion for the position in question after applying for it, I am being overlooked for internal opportunities, especially when I am eligible and capable of the role.

- **Grutter v. Bollinger, 539 U.S. 306 (2003)**
- **United Steelworkers of America v. Weber, 443 U.S. 193 (1979)**

## F. American Disability Act,

**Failure to Accommodate & Reasonable Accommodation**

- **U.S. Airways, Inc. v. Barnett, 535 U.S. 391 (2002)**
- **Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002)**
- **EEOC v. Wal-Mart Stores, Inc., 201 F.3d 883 (6th Cir. 2000)**
- **Kosakow v. New Rochelle Radiology Associates, 274 F.3d 706 (2d Cir. 2001)**

## 2. Undue Hardship & Employer's Obligations

- **Chevron U.S.A., Inc. v. Echazabal, 536 U.S. 73 (2002)**
- **Bercovitch v. Baldwin School, Inc., 133 F.3d 141 (1st Cir. 1998)**

## 3. Disability Discrimination & Retaliation Under the ADA

- **Kosakow v. New Rochelle Radiology Associates, 274 F.3d 706 (2d Cir. 2001)**

- McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)
- Mayo v. PCC Structural, Inc., 317 F.3d 1121 (9th Cir. 2003)

### 4. Interactive Process and Employee's Right to Request Accommodation

- Vande Zande v. Wisconsin Department of Administration, 44 F.3d 538 (7th Cir. 1995)
- Cehrs v. Northeast Ohio Alzheimer's Research Center, 155 F.3d 775 (6th Cir. 1998)

### 5. Precedents on Reasonable Accommodation for Disabilities (Physical Limitations)

- Smith v. Braunschweig, 25 F.3d 217 (8th Cir. 1994)
- Borkowski v. Valley Central School District, 63 F.3d 131 (2d Cir. 1995)

### 6. Disability Discrimination and Adverse Employment Actions

- Wynne v. Tufts University School of Medicine, 976 F.2d 791 (1st Cir. 1992)

---

## V. LEGAL CLAIMS

### Count I – Racial Discrimination in Violation of Title VII of the Civil Rights Act (42 U.S.C. § 2000e-2)

24. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

25. Defendant engaged in unlawful employment practices by subjecting Plaintiff to disparate treatment based on her race, including but not limited to denying her training, resources, and equitable assignments.

### Count II – Retaliation in Violation of Title VII of the Civil Rights Act (42 U.S.C. § 2000e-3)

26. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

27. Defendant retaliated against Plaintiff for reporting discriminatory practices by scrutinizing her work unfairly, assigning her unreasonable tasks, and creating a hostile work environment and lawsuit.

### Count III – Hostile Work Environment in Violation of Title VII

28. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

29. Defendant's actions created a workplace permeated with discriminatory intimidation, ridicule, and insult that was severe and pervasive enough to alter the conditions of Plaintiff's employment.

**Count IV – Failure to Accommodate in Violation of the Americans with Disabilities Act (42 U.S.C. § 12112)**

30. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

31. Defendant failed to provide reasonable accommodations for Plaintiff's workplace injury and instead penalized her for her resulting limitations.

## VI. RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

1. Award compensatory damages for emotional distress, pain, suffering, and loss of enjoyment of life.

2. Award back pay, front pay, and other lost wages and benefits.

3. Award punitive damages to deter future discriminatory and retaliatory practices.

4. Order Defendant to provide training on anti-discrimination laws to its employees and management.

5. Award Plaintiff her costs, including court fees, relocation expenses, and any other expenses incurred in pursuing this action.

6. Grant any other relief this Court deems just and proper.

## VII. JURY TRIAL DEMAND

The plaintiff demands a trial by jury on all issues so triable.

**DATED:** January 27, 2025

Respectfully submitted,

**Priscilla Cannion**
1015 North Alexander Street, Unit 632
Charlotte, North Carolina 28206
Phone: 321.271.3265
email: priscilla.m.cannion@gmail.com

**Racial and Disability Discrimination, Retaliation, and Wrongful Termination Complaint**
**Priscilla Cannion vs. Wells Fargo Corporate Investment**

My name is Priscilla Cannion, and I am a Black woman who was initially hired as an Institutional Investment Operations Specialist at Wells Fargo Corporate Investment on April 17, 2023. At the time that I was hired, I was one of three Black employees reporting to Michael Marciano. In April 2024, my title was changed to Assistant Vice President. This is the position that I held until I was wrongfully terminated on August 20, 2024.

From the date my employment began until the date I was wrongfully terminated, I experienced challenges with my direct supervisor, Michael Marciano *(Director of Capital Markets/White male)*, and skip-level supervisor, Carlos A. Gomez (*Director of Asset Services/Hispanic male),* that I believe were the result of both overt and covert racial and disability discrimination. Furthermore, it appears that they used their power, influence, and authority to inspire others in the organization to conspire against me, creating a racially hostile work environment that made it impossible for me to succeed.

## FACTUAL DATA

On **April 17, 2023**, Yesenia Scott, a Hispanic female, and I both began our employment as Institutional Investment Operations Specialists **(Exhibit 35)** reporting to Michael Marciano *(Director of Capital Markets/White male)* who worked remotely in New York **(Exhibit 39)**. Despite starting on the same day, in the same position, and with the same requirement to relocate from Florida to North Carolina, our onboarding experiences were drastically different.

First, Yesenia was approved to work 100% remotely in Florida from April 17, 2023, until May 31, 2023, after the academic year ended at many Florida schools. I, on the other hand, was denied an equal opportunity to do the same by Michael, who required me to work onsite at the Charlotte location starting on April 17, 2023. This decision forced me to relocate to North Carolina one and a half months earlier than Yesenia a full month before my son's high school graduation. This unfair treatment placed a significant and unfair emotional and financial burden on me that not only forced me to find alternative care for my son so he could remain in Florida for graduation, but also forced me to abandon him during a critical and special time in his life. The distress caused by this discriminatory decision added undue pressure, both personally and professionally, as I had to navigate a new work environment while managing the emotional toll of being separated from my son during such an important milestone.

Second, Yesenia, and other non-Black peers with the same job title including William "Bill" Siano and Sarah Stone, received relocation and sign-on bonuses as part of their job offers. I, on the other hand, received no such benefits, despite the significant inconvenience and financial burden of relocating. This unequal treatment further compounded the challenges I faced, especially as a single mother. Not only did I have to secure and pay for alternate care for my son so he could remain in Florida for his graduation, but I also had to bear the full financial burden of relocating my family without the same support provided to my non-Black peers. This disparity reflected a pattern of inequitable treatment that unfairly added to my personal and professional hardships.

Third, Yesenia received full access to all Wells Fargo systems needed to perform her job in June 2023, after the two-month waiting period expired. Her access included, but was not limited to, the following:

- **Alfresco**: A document management and collaboration system, often used to store and manage large amounts of financial data and transaction documents.

- **DTCC (Depository Trust & Clearing Corporation)**: a system related to the clearance and settlement of securities transactions, as DTCC handles the post-trade settlement for institutional trades.

- **Broadridge**: Often used for proxy voting, shareholder communications, and trade processing in investment operations.

- **Clearstream**: A system used for the settlement of international securities transactions and cross-border trading, which is critical for handling global investments.

- **BaNCS**: A core banking system that could be involved in handling securities processing and reconciliation of payments.

- **BNP:** A platform used for trade settlement, claims processing, or reconciliation of institutional trades.

- **Microsoft Office Suite**: Specifically, **Excel** for managing data, financial modeling, and transaction reporting.

- **BNP Approval Folder:** a folder used to submit screenshots of completed work for approval

- **CS Approval Folder:** a folder used to submit screenshots of completed work for approval

- **P&L:** a Microsoft Outlook Group Inbox used to submit completed work for approval via email and receive feedback.

- **ASAPPROVALS:** a Microsoft Outlook Group Inbox used to submit completed work for approval via email and receive feedback.

This access allowed her to engage directly with core systems immediately after the two-month waiting period expired and begin comprehensive, hands-on training on utilizing each platform. My access to all core systems, on the other hand, was trickled in starting with access to Microsoft Office Suite in June 2023. By the end of August 2023, I still did not have full access to all core systems that Yesenia had access to. By January 2024, I still did not have full access to all core systems. This is evidence by the email response I sent to Michael on January 2, 2024, in which I informed him that all emails that I sent from the P&L mailbox were constantly rejected which I later discovered were the result of limited access **(Exhibit 5h, 3rd paragraph titled "Email Response")**.

This trickled-in access to core systems denied me an equal opportunity to engage directly with the necessary platforms once the two-month waiting period had passed and prevented me from receiving the same comprehensive, hands-on training on using these systems that Yesenia received. This lack of access prevented me from developing the skills needed to effectively perform my job and put me at a clear disadvantage from the start.

To make matters worse, after Yesenia received full access to all core systems, she was trained by Michael Marciano himself, as well as Sarah Stone, the only Senior Institutional Investment Operations Specialist (White female) on our team. Sarah was a seasoned employee who worked onsite and had 2 years of direct experience working in operations at Wells Fargo and training new hires **(Exhibit 34a)**. By receiving training from both our direct supervisor and the most experienced person in our role, Michael guaranteed that Yesenia received the comprehensive training she needed to perform her job that set her up for success right from the start and led to her promotion to Senior Institutional Investment Operations Specialist a year later in 2024 **(Exhibit 36)**.

I, on the other hand, was denied an equal opportunity to receive the same guidance, support, and training that Yesenia received.  Although Yesenia and I had the same job title and began our employment on the same day, Michael did not provide us with training at the same time. Instead, he provided Yesenia with training separate from me and informed me that my training could not begin until I received full access to core systems. As a result, Michael stated that my training would begin after he relocated from New York and instructed me to shadow William "Bill" Siano, the least experienced person on our team, to gain an understanding of how to perform my job instead of allowing me to participate in the training that both he and Sarah gave Yesenia.

Bill was an Institutional Investment Operations Specialist (Indigenous male) with only five months of direct experience working in operations at Wells Fargo **(Exhibit 34b)**, and only three months of direct experience using all core systems (due to the 2-month waiting period). Michael's directive to shadow Bill coupled with his failure to ensure that I received the same access to core systems given to Yesenia guaranteed that I would not receive the training or the systems access I needed to perform my job, putting me at a huge disadvantage and setting me up for failure right from the start, leading to my wrongful termination on August 20, 2024 **(Exhibit 9)**.

Adding to this already challenging situation, in July 2023, Carlos Gomez assigned me a regulatory project to complete during his weekly staff meetings, instead of assigning someone else to complete the task. This project, which had nothing to do with my actual job responsibilities, required me to observe the training methods of several tenured employees in the Corporate Actions department and provide feedback to help Janelle De Paul (Vice President Voluntary Corporate Actions - Asset Services/Hispanic female) meet a deadline related to a regulatory compliance violation. The employees I observed—Precious Bowser **(Exhibit 40)**, David Bialer **(Exhibit 41)**, and Elizabeth Furtado **(Exhibit 42)**—all worked in Corporate Actions and completed tasks that were completely unrelated to my position in Operations. And while I provided feedback based on my observations of their training methods, none of this was relevant to my own job or provided me with the training or guidance I needed to perform my duties. This

diversion further compounded the training gaps I experienced, as Yesenia received comprehensive training, and contributed to the unequal treatment and discrimination I faced during my employment.

These incidents violate the following EEOC regulations:

- **Disparate Treatment**: The unequal treatment I received compared to my non-Black peers, specifically Yesenia, in terms of remote work flexibility, relocation benefits, system access, and training opportunities, is a clear violation of Title VII. Yesenia, who started on the same day and held the same position, was provided with advantages that I was denied, which demonstrates race-based disparate treatment.

- **Failure to Provide Equal Training Opportunities**: Michael's decision to provide Yesenia with direct training from both him and Sarah Stone while denying me access to that same training constitutes a violation of Title VII. By not receiving the same level of training and support, I was left unable to perform my job to the same standard, putting me at a significant disadvantage compared to my non-Black peers.

- **Retaliation**: After refusing to take part in the discriminatory treatment of Eric Brooks and reporting discriminatory behavior to Carlos, I experienced retaliation from Michael, who further delayed my access to critical systems and continued to withhold proper training. This retaliation for not aligning with discriminatory practices violates protections under Title VII.

- **Hostile Work Environment**: The ongoing discrimination and exclusion I faced, including the denial of equal training, withholding of system access, and participation in non-job-related projects, created a hostile work environment. These actions were part of a larger pattern of behavior intended to set me up for failure and isolate me from my peers.

- **Discriminatory Termination**: The culmination of these discriminatory practices led to my wrongful termination on August 20, 2024. My termination, based on the lack of training, unequal treatment, and retaliatory actions, was a direct result of the discriminatory environment fostered by Michael and Carlos, violating EEOC regulations related to discriminatory discharge.

By **August 2023**, Michael Marciano had relocated and was working onsite and his direct reports, including me, worked hybrid schedules. However, during a two-day absence getting his driver's license and car tags updated, Michael's direct supervisor, Carlos A. Gomez *(Director of Asset Services, Hispanic male)*, held an onsite meeting with me and Sarah Stone *(Senior Institutional Investment Operations Specialist, White female)*, the only employees on Michael's team working onsite that day.

During the meeting, Carlos said, "I'm not going to say the name of this person, but we're trying to get him out of here and I'd appreciate it if you guys don't laugh when he does something funny."

When Carlos asked us not to "laugh when he does something funny", I instantly knew that Carlos was referring to Eric Brooks, one of two Black men who also reported to Michael Marciano, my direct

supervisor. Eric Brooks was a Capital Markets Institutional Operations Support Analyst with four years of direct experience working at Wells Fargo (Exhibit 37).

Assuming Carlos was joking, I laughed until Sarah chimed in, saying, "Some people think it's funny, but he is really causing a lot of harm."

Recognizing the racial undertones in Carlos' discriminatory remark, I asked Sarah what Eric was doing to cause harm because he sat next to her and figured she would know. Sarah replied that he stood up and hovered over her desk to talk to her. I responded, "Everyone in the building does that. In fact, Bill does the same thing to talk to you."

Sarah also criticized Eric for taking his laptop to the bathroom and covering his camera with tape during virtual meetings. Confused, I asked how those actions were harmful to anyone and noted that none of the behaviors she described were illegal or violated Wells Fargo's code of conduct policies.

Since Carlos was involved in my interview process, he was aware of the Human Resources knowledge I acquired during my management tenure at Wells Fargo in Florida. Leveraging this knowledge, he asked me, "How can we get this guy out of here?" I reiterated that from what was described, there seemed to be nothing that would justify termination.
Having experienced racism during my time in Florida, I was determined not to participate in discriminatory practices against a fellow Black colleague. Undeterred, Carlos approached my cubicle, pulled up a chair, and sat beside me, which made me feel extremely uncomfortable and cornered as Sarah watched. His proximity, combined with the directness of his approach, heightened the pressure I was already feeling. Then Carlos said, "Tell me how we can get rid of this guy. What steps do we need to take?"

As Carlos sat there, persistently asking me for advice on how to "get rid of" another Black colleague, I felt sick because Carlos, my skip-level manager, was pressuring me to participate in unethical and discriminatory behavior, putting me in an incredibly difficult position.

Amidst our conversation, Sarah chimed in with another disturbing claim, this time accusing Eric of neglecting his duties. Her comment was particularly troubling because Eric didn't report to her; he reported directly to Michael. It left me wondering how she would even know about his performance and raised suspicions that Sarah and Carlos were conspiring against Eric. In response, I firmly said, "If that's the case, Carlos, the appropriate action would be to formally document his performance issues." I hoped to redirect the conversation toward a more professional and ethical course of action, but the entire situation left me feeling uneasy because Carlos was clearly disappointed. By the end of the week, Carlos, Michael, Sarah, Yesenia, and Janelle De Paula *(Vice President Voluntary Corporate Actions - Asset Services/Hispanic female)* were discriminating against Eric—not making eye contact with him, ignoring him when he greeted them in the morning, and not acknowledging his presence when he said something funny.

==Then, Michael retaliated against me for not aligning with their discriminatory efforts. Instead of providing me with the comprehensive training he assured me it would occur after he relocated, he==

required Bill Siano, the least experienced person on our team **(Exhibit 34b)** and the one I had been shadowing, to train me instead of doing it himself. To make matters worse, Michael didn't tell Bill that he was now responsible for training me. When I informed Bill, he was shocked, admitting that he was not prepared or experienced enough to take on a training role.

The problem with being trained by Bill was that he lacked the qualifications and depth of understanding required for effective training. Although he was trained by Sarah Stone, he admitted that he memorized the steps of his tasks without grasping the underlying principles, which limited his ability to answer questions or provide meaningful guidance. When I sought clarification on the reasoning behind certain process steps to gain a better understanding, Bill was unable to explain, admitting that he mimicked Sarah's action during his own training with her without understanding the rationale behind them.

To further complicated matters, after requiring Bill Siano to train me, Michael began assigning me tasks to complete, fully aware that I did not have the training or access to the core systems that everyone in our department had access to, including Yesenia, who received access three months earlier.

Without access to the systems needed to retrieve and submit the work that Michael was now assigning to me, I was forced to rely on Bill to retrieve and submit my work for me. And because of the lack of proper training I received, mistakes were inevitable. However, instead of using my mistakes as training opportunities to provide me with guidance, Michael used email as the primary method to communicate mistakes to formally document my errors. When I requested Michael's assistance with resolving the issues that were being raised due to the inadequate training I was receiving from Bill, he repeatedly deferred me back to Bill, providing no guidance or support. When I sought guidance from Sarah and Yesenia as I attempted to learn and perform my job, they reported my requests for help to Michael prompting him to institute a rigid chain of command that Yesenia was not required to follow. The chain of command required me to direct all job-related questions to Bill first. If Bill couldn't provide an answer, I could then ask Sarah for help, and only if Sarah didn't know the answer could I then go to Michael **(Exhibit 5h, paragraph 2 titled 'Neglected')**. This system created a never-ending cycle of retaliation and abuse, leaving me without training, guidance, and support as Yesenia continued to receive preferential treatment.

On **September 15, 2024**, Eric Brooks' employment was terminated.

Shortly thereafter, Nick Casimir—the only other Black employee reporting to Michael—confided in me. Nick transferred into our department six months before my start date and noticed a troubling pattern pattern. He shared that both Nick and I were hired to replace two former Black employees whose employment had ended under similarly suspicious circumstances. Nick also opened about his own struggles with Carlos Gomez's overt micromanagement, explaining that he was forced to sit directly next to Michael Marciano, constantly working under his watchful eye. Like me, Nick was also denied comprehensive training, with every mistake he made being highlighted and scrutinized.

This revelation led me to a disheartening realization: Michael and Carlos had a history of hiring Black employees, not with any genuine interest in inclusion or long-term growth, but to create the appearance of diversity. Once hired, we were systematically denied the training, guidance, and resources necessary

to succeed. Our mistakes, which were inevitable without proper training, were then documented and used as justification for either terminating our employment or pushing us to quit.

These incidents violate the following EEOC regulations:

1.  **Race Discrimination**: The actions taken by Carlos Gomez and Michael Marciano, particularly the targeted exclusion and eventual termination of Eric Brooks, along with the unequal treatment and lack of support I experienced, are clear examples of race-based discrimination. The preferential treatment given to non-Black employees, such as Yesenia, in terms of access to resources, training, and support, further underscores the discriminatory practices at play.

2.  **Hostile Work Environment**: A hostile work environment is created when discriminatory conduct is so severe or pervasive that it alters the conditions of employment. The exclusion of Eric, the discriminatory comments made by Carlos, the retaliation I faced for not participating in the mistreatment of Eric, and the intentional isolation and mistreatment of me all contributed to a racially hostile work environment. The systematic denial of training, the rigid and punitive chain of command, and the pattern of scrutiny aimed at Black employees like me, Nick, and Eric, created a work environment that was not only unfair but emotionally and mentally exhausting.

3.  **Retaliation**: Retaliation occurs when an employer takes adverse action against an employee for engaging in protected activity, such as opposing discriminatory practices. After I refused to participate in the discriminatory treatment of Eric and tried to address the unfair practices with Carlos and Michael, I experienced retaliation in the form of inadequate training, increased scrutiny, and isolation. Michael's refusal to provide me with proper guidance and his decision to institute a chain of command that limited my ability to seek help were clear retaliatory actions for not aligning with their discriminatory behavior.

4.  **Disparate Treatment**: Disparate treatment refers to treating one employee differently than others because of their race. In this case, the differences between how I and my Black colleagues were treated compared to how Yesenia and other non-Black employees were treated were stark. While Yesenia received full access to systems, comprehensive training, and a supportive work environment, I was denied the same opportunities, which severely impacted my ability to succeed. The chain of command imposed on me and the reliance on Bill, who was unqualified to train me, only further isolated me and contributed to the discriminatory treatment.

These incidents reflect a troubling pattern of racial discrimination, retaliation, and hostile work environment, all in violation of EEOC regulations. The targeted mistreatment and exclusion of Black employees like Eric, Nick, and myself not only impacted our ability to succeed professionally but also fostered a deeply toxic and discriminatory workplace culture.

On September 18, 2023, after 5 months of being neglected by Michael (Exhibit 5d, bullet point #2), he finally conducted a one-on-one meeting with me which I hoped was to begin training. During the meeting, he discussed the errors in my work and asked about the challenges I was facing. At that time, I

explained that my work pace was slower than I would like due to the inadequate training I was receiving from, which left me uncertain about how to perform my job properly. In response, Michael explained that it typically takes two to three years to fully learn the role **(Exhibit 5d, bullet point #2)** and reassured me that initial slowness was normal.

I also asked Michael when my training with him would begin. In response, Michael instructed me to bring two emails containing work I was struggling with to our next one-on-one meeting, promising to use them as examples for training to help me improve. Michael then scheduled a recurring one-on-one meeting on my calendar titled "**Mike / Priscilla 1: 1**" **(Exhibit 18b)**. The first meeting was set for Tuesday, September 26, 2023, at 2 PM, and was scheduled to occur every two weeks thereafter on Tuesday at the same time.

When I opened the meeting invite to accept it, I discovered that 7 instances of our recurring meeting conflicted with Carlos Gomez's weekly staff meeting that was scheduled on the same day and time **(Exhibit 18b)**. Michael and I were both required to attend Carlos' weekly staff meeting, so I brought the conflict to his attention in hopes that he made a mistake. However, Michael never rescheduled our recurring one-on-one meeting to resolve the scheduling conflict, never removed our recurring one-on-one meeting from our calendars, and **never conducted a single one-on-one meeting with me again** **(Exhibit 18c)**.

Instead, Michael canceled each meeting as it approached but kept each meeting active on our calendars. By keeping each meeting active on our calendars, Microsoft Teams showed Michael and me as 'busy' during our scheduled one-on-one meeting time, creating an illusion that we were consistently having these meetings. We were attending Carlos' weekly staff meeting on the same day at the same time, which prevented our one-on-one meetings from ever taking place.

Feeling frustrated and concerned, I confided in Nick, the other Black employee reporting to Michael, sharing my intention to file a racial discrimination complaint. He expressed a desire to join the complaint due to the discriminatory treatment he was experiencing from both Carlos and Michael. However, I advised him to let me proceed independently with the filing. Given his youth and inexperience in gathering the necessary evidence, I was concerned that his involvement might increase his visibility and risk of being targeted further. I felt it was crucial to protect him from potential retaliation while addressing our shared concerns through formal channels.

By **December 27, 2023**, I had been reporting to Michael Marciano for eight months without receiving the equal opportunity to succeed that was given to Yesenia. I was deeply disappointed with my lack of development and took the initiative to schedule a recurring meeting with Michael myself titled "**One on One**" to hold him accountable for providing me with the comprehensive training. I scheduled this new series of meetings to occur every Thursday at 3:00 PM, starting on January 4, 2024, a time I saw as available on his calendar. Michael accepted my meeting invitation at 4:27 PM on the same day **(Exhibit 18d)**.

Additionally, on **January 2, 2024**, I declined Michael's original recurring one-on-one meeting that he scheduled to conflict with Carlos Gomez's weekly staff meeting and added a comment stating, "**Conflicts**

with weekly staff meetings for almost 6 months now" (Exhibit 18c) and looked forward to the one-on-one meeting that I scheduled with Michael on January 4, 2024. Disturbingly, Michael canceled that one-on-one meeting, too, and I was left in despair.

These incidents violate the following EEOC regulations:

1. **Hostile Work Environment**: Title VII protects employees from discriminatory practices that create a hostile work environment. Michael's pattern of canceling meetings and denying me access to the same level of training that Yesenia received to effectively perform her job contributed to a hostile work environment. His lack of support and failure to engage in scheduled meetings were forms of neglect that impaired my ability to perform my duties.

2. **Retaliation**: By failing to provide the scheduled one-on-one meetings, Michael indirectly retaliated against me by withholding the necessary training and guidance that should have been provided. Retaliation does not only occur when direct punitive actions are taken, but also when resources are deliberately withheld, preventing an employee from succeeding in their role. This falls under the **Retaliation Protections** enforced by the **EEOC**, as his actions appeared to be a response to my need for guidance and training.

3. **Discriminatory Treatment**: Michael's repeated cancellation of our one-on-one meetings, combined with his misrepresentation of our meetings on **MS Teams**, can also be seen as a form of discriminatory treatment. As a result of being denied regular, consistent training, I was left in a position where I was not given the same opportunities to succeed as my peers. This pattern of behavior is a form of disparate treatment, which is prohibited.

On October 13, 2023, as part of my six-month evaluation, I was required to complete the employee self-assessment (Exhibit J). Completing this evaluation was particularly challenging because I still didn't have full access to the group inboxes used to receive and submit work assignments, despite reporting to Michael for six months. As a result, I couldn't even submit the completed employee self-assessment myself, I had to rely on Bill to submit it for me. Despite these barriers, I took the self-assessment seriously and provided a comprehensive review of my experiences and contributions.

In paragraph one of the self-assessments titled "New Employee (Self)", I stated that "I have assisted tenured employees by giving feedback on their training styles and methods." This statement was made in relation to the regulatory project Carlos Gomez assigned to me to complete in July 2023 during his weekly staff meetings. This project, which had nothing to do with my actual job responsibilities, required me to observe the training methods of several tenured employees in the Capital Markets department and provide feedback to help Janelle De Paul *(Vice President Voluntary Corporate Actions – Asset Services/Hispanic female)* meet a deadline related to a regulatory compliance violation. The employees observed, including Precious, David, and Liz, all worked on tasks that were completely unrelated to my role and reported to Dan in capital markets, Carlos' direct report.

While I provided feedback based on my observations of their training methods on capital markets functions, none of this was relevant to my own job or provided me with the training or guidance I needed to perform my duties. This diversion further compounded the training gaps I experienced and contributed to the systemic pattern of unequal treatment and discrimination I faced during my employment.

* * * * * *

In the same paragraph of my self-assessment, I also mentioned that "**I have successfully communicated the gaps in various areas of my training which will assist in future training.**" Throughout my tenure, I repeatedly told Michael Marciano that the training I was receiving from Bill Siano was inadequate because Bill, the colleague assigned to train me, did not have the depth of knowledge to answer my questions or provide meaningful guidance. Bill himself admitted that he had memorized the steps without fully understanding the reasoning behind them, which further limited his ability to train me properly.

* * * * * *

In the same paragraph of my self-assessment, I stated, "**I have accomplished how to improve errors by being able to make errors and respond to the original instructions given versus the details missing from the original instructions, and I can create updated procedures.**" During my first six months of employment, I encountered frequent instances where the instructions Bill Siano gave me on how to complete a task were either incomplete or unclear. This led to errors that Michael Marciano documented in email communications back to me, but instead of just accepting the mistakes, I took the initiative to reflect on them, and did my best to resolve the issues relying on my own problem-solving skills due to the lack of proper training and guidance, and figure out the gaps between what I was instructed to do and what Michael said was incorrect after I did it, in hopes of creating improved processes to prevent the same mistakes from happening.

* * * * * *

In paragraph two of the self-assessment titled "**Cross Training**", I stated, "**I have been able to attend several trainings such as but not limited to sitting with various colleagues to learn various areas of my job such as a better understanding of Banc, DTCC, Broadridge, Clearstream, and S&P.**" This statement refers to the general virtual training sessions provided by representatives of each system or other Wells Fargo personnel outside of our department that I attended with Bill while sitting at Bill desk. These virtual training courses were general in scope, standardized to provide user training for employees across the company, and were not designed to provide me with in-depth knowledge or practical experience specific to my position and that Yesenia received during her training with Michael and Sarah Stone. It also referred to the colleagues in Corporate Actions—Precious Bowser **[Exhibit 40]**, David Braler **[Exhibit 41]**, and Elizabeth Furtado **[Exhibit 42]** — that Carlos Gomez required me to observe in July 2023 as part of the regulatory project that had nothing to do with my actual job responsibilities, and required me to observe their training methods and provide feedback to meet a deadline related to a regulatory compliance violation. As I mentioned, the employees I observed all worked in Corporate Actions and completed tasks that were completely unrelated to my position in Operations. And while I provided feedback based on my observations of their training methods, none of this was relevant to my own job or provided me with the training or guidance I needed to perform my duties.

This evaluation process brought into sharp focus the systemic issues that had been hindering my performance from the outset. I was asked to evaluate my progress even though I had not been equipped

with the basic tools or support that were necessary to succeed. The inequities in system access and training, combined with the additional burdens placed on me, created a significant disadvantage compared to my non-Black colleagues, including Yesenia, who had received proper training and access.

The fact that I had to rely on Bill to submit my evaluation for me further exemplifies the barriers I faced in performing even the simplest tasks. These ongoing obstacles contributed to a feeling of isolation and frustration, and the lack of support only reinforced the discriminatory practices within the department.

While I did my best to contribute positively to the team and overcome the challenges I faced, the systemic denial of access, training, and resources severely impacted my ability to succeed. This evaluation, rather than reflecting my true potential, highlights the discriminatory practices that were undermining my progress from the very beginning.

On **November 17, 2023**, I fell on company property, sustaining a workplace injury, and subsequently began receiving workers' compensation. By **December 14, 2023**, my injury had worsened, requiring further medical evaluation, and it became apparent that surgery might be necessary due to a torn ligament and other complications. I communicated this information to David Bialer, Director of Voluntary Corporate Actions, and in his response, he copied my direct supervisor, Michael Marciano, and Carlos Gomez **(Exhibit 2a)**. At this point, I was required to wear brace on my left hand, which significantly limited my ability to type on a computer keyboard, a significant part of my job.

Despite being on workers' compensation and having provided a doctor's note stipulating that I be allowed to take up to 6 hours of breaks per day to manage my condition **(Exhibit 43)**, Michael discriminated against me, complaining that I was working too slowly, and instituting a new requirement that all my completed work be submitted to him for approval. On numerous occasions, I submitted my completed work to Michael early in the morning, yet he would not review it until just before my shift was scheduled to end, forcing me to stay late while he completed his review even though he knew I was a single mom. Even more disturbing, when Michael found errors, he never used those errors as training opportunities to provide me with coaching and guidance. Instead, he weaponized emails to document my mistakes, creating an illusion of incompetence, and causing me an enormous amount of fear and sleepless nights as he moved forward with derailing my career.

The discrimination I experienced during my first 8 months of employment was horrific. But the discrimination that followed was so pervasive and severe that by the end of January 2024, I was experiencing depression and panic attack as Michael ramped up his efforts to terminate my employment when I needed it the most. It started when Bill went on vacation during the Christmas season and Michael assigned me to provide coverage during Bill's absence, instead of someone more experienced, fully trained, and with full access to all systems like Yesenia or Sarah Stone.

It started on **Thursday, December 21, 2023**, at **4:14 PM**, when Michael sent an email to me to process in Bill's absence titled **ADR Fee – Interco SPOs** and copied Sarah Stone **(Exhibit 33b)**. SPOs was a function that I had never been trained on. In fact, I didn't even know what SPOs stood for at the time. I also had not been trained on Alfresco, the system Bill used to complete SPOs.

Because Michael copied Sarah Stone on the email, I asked her for help. However, Sarah informed me that it was passed the DTC cutoff time to process SPOs and to try again the next day. When I heard this information, I couldn't help but wonder why Michael sent me an SPO to process when he knew the cutoff time and knew I had no knowledge on how to complete the task.

On the morning of **Friday, December 22, 2023**, I logged into Alfresco for the first time but couldn't move forward after logging in because I had not been trained and there was something that needed to occur before Alfresco would allow me to move forward. I emailed Michael requesting assistance, and he sent me a new Alfresco link via MS Teams which did not resolve my issue. I responded back to his MS Team's message with a screenshot showing that I could not move forward, but he didn't respond until 3:00 PM, even though I had messaged him that morning. In his response, he stated that "**it was past the cutoff time**" and instructing me to "**ping him**" **the next day when there were more examples.**

On Saturday, December 23, 2023, our office was **closed for the weekend.**
On Sunday, December 24, 2023, our office was **closed for the weekend.**
On Monday, December 25, 2023, our office was **closed for Christmas.**

On the morning of **Tuesday, December 26, 2023**, I returned to work, checked Michael's calendar availability in the scheduler, and "**pinged**" him as instructed by scheduling a meeting on his calendar titled "**Learn Alfresco**" for Thursday, December 28, 2023, at 3:30 PM.

However, on **Wednesday, December 27, 2023**, at 4:52 PM, Michael declined the "**Learn Alfresco**" training meeting I had scheduled on his calendar [Exhibit 13c]. He justified his actions by stating, "**This is past DTC cutoff, and I have conflicts booked at this time. Ping me in the morning when you are going through SPOs...**"

Michae's response was confusing. When I checked Michael's calendar prior to scheduling the meeting, it showed availability for December 28 at 3:30 PM, contradicting his claim that there were scheduling conflicts and proving that he was avoiding providing me with training, once again.

The ongoing racial discrimination and retaliation I was constantly being subjected to take a toll on my mental health, ultimately causing me to call in sick on **Thursday, December 28 and Friday, December 29, 2023**. I expected Michael to assign someone to provide coverage during my absence as he had required me to do for Bill during his absence.

On Saturday, December 30, 2023, our office was **closed for the weekend.**
On Sunday, December 31, 2023, our office was **closed for the weekend.**
On Monday, January 1, 2024, our office was **closed for New Year's Day.**

On **Tuesday, January 2, 2024**, I returned to work and was happy to see Bill, who was now back in the office.

On Wednesday, January 3, 2024, at 8:20 AM, I received an email from Michael asking, "Hi – are these complete now? I haven't heard from you on needing help with Alfresco since I sent the attached [declining the Alfresco training meeting] last week" (Exhibit 13b).

When I received Michael's email, I was shocked to discover that he did not assign anyone to provide coverage for me in my absence. Confused, I responded to Michael's email at 9:11 AM, stating, "...My first day back was yesterday since the appointment decline from 12/27/23. If it was not covered while I was out, then I believe it needs to be completed unless someone else covered it. I can check with Bill and make sure he has not covered it yet. Thanks" (Exhibit 13b).

After confirming with Bill that Michael did not assign anyone to provide coverage for me or ask Bill to complete the task since it was Bill's responsibility to do so, at 10:11 AM, I emailed Michael again to provide an update stating, "No, this is not complete as far as I am aware..."

Confused, I responded to Michael's email again to remind him that I have never been trained on SPOs stating, "You mention in a previous message to ping you in the morning when I am going through SPOs. I am not sure what you mean by that; I don't go through SPOs. Can you advise" (Exhibit 13c)? I also included a screenshot of the "Learn Alfresco" training meeting that he had declined on December 27, 2023.

Three minutes later, at 10:14 AM, Michael responded sharply, stating, "Priscilla, I have been asking you to complete this for nearly two weeks now. We have discussed multiple times the DTC cutoff times for SPO processing and that these need to be done prior to the cutoff, preferably in the morning. I have also asked you several times to ask me for help if you need it. This needs to be done today. If you need help in completing an SPO, please ask for it" (Exhibit 13d).

At 10:47 AM, I replied, expressing my frustration and ongoing confusion, stating

"Mike – I have equally been asking for your help just as long. Why are we not using the original email chain of communication concerning this ADR Fee?

• I asked Sarah for assistance the first time I attempted to complete this fee and she informed me that it was too late to complete at that hour...

• I asked you the next day for help after realizing that there was something wrong with my alfresco and you sent me a link. However, you were away from your desk and did not see and respond back to me until after 3:00 PM and you stated it was past the cut off ping you the next day when there are more examples. Once again, I do not complete SPO's and I am unaware of what you mean by this

• ... I set an appointment on the calendar ["Learn Alfresco"] to make sure we did not miss one another, and you declined...

• The next day I was out sick December 28th through December 29th, 2023.

• There was the weekend and New Year's break January 1st, 2024. I was back yesterday January 2nd, 2024, and it was not brought to my attention that it was not covered while I was out. I would have thought it would have been completed while I was out since there is such an urgency..." (Exhibit 13d).

These incidents violate the following EEOC regulations:

1. **Disparate Treatment**: The unequal treatment I experienced regarding access to core systems, the lack of proper training, and the distinct advantages given to non-Black peers such as Yesenia demonstrate race-based disparate treatment. Michael provided others, such as Yesenia and Bill, with full access to systems and comprehensive training, yet withheld these from me for an extended period. This unequal treatment based on race is a violation.

2. **Failure to Provide Reasonable Accommodation**: After sustaining a workplace injury and being placed on workers' compensation, I provided medical documentation requesting breaks to manage my condition. Instead of accommodating my condition, Michael retaliated by scrutinizing my work pace and instituting policies that further burdened me, such as requiring all of my work to be submitted to him for approval. His refusal to provide reasonable accommodation and use my injury as a basis for discriminatory treatment is a violation of the ADA.

3. **Hostile Work Environment**: Michael's continual refusal to provide proper training, his weaponization of email to document every mistake without providing guidance, and his unreasonable demands created a hostile work environment. The ongoing harassment and retaliation I faced due to my race and medical condition contributed to a toxic workplace in which I was set up to fail.

4. **Retaliation**: When I refused to participate in discriminatory actions against Eric Brooks, I was subjected to further retaliation by Michael and Carlos. This retaliation is also evident in the increased scrutiny I faced, the denial of training, and the withholding of systems access, all of which escalated after I reported discriminatory behavior. Title VII protects employees from retaliation for opposing discriminatory practices, and this protection was violated in my case.

5. **Discriminatory Termination**: The series of actions that led to my wrongful termination on August 20, 2024, including the lack of training, access to necessary systems, and the retaliation I endured, indicate that my termination was a direct result of the discriminatory and retaliatory actions I faced throughout my employment. This wrongful termination was based on a pattern of racial discrimination, violating EEOC regulations related to discriminatory discharge.

6. **Failure to Engage in the Interactive Process (ADA)**: Michael's refusal to engage in a meaningful dialogue about my medical restrictions after I was injured further violated my rights under the ADA. Despite receiving my medical documentation and knowing I required additional breaks to manage my condition, Michael ignored my requests and instead imposed additional burdens on me, failing to accommodate my disability appropriately.

These incidents together illustrate a clear pattern of discriminatory practices, hostile work conditions, and violations of both ADA and Title VII protections, which severely impacted my ability to perform my job effectively and ultimately led to my wrongful termination.

On December 26, 2023, as I was providing coverage for Bill during his absence, Michael emailed me to point out that I had missed payment. At 12:34PM, I replied stating, "Yes, my apologies it was missed I did not see this payment it was allocated to us around 3:30PM (Exhibit 4a, bottom)."

At **12:34** PM, Michael responded stating, "Sorry—not entirely following. 3:30 is within the regular daily DTC allocation window so I don't see why there would be an issue there..." (Exhibit 4b, bottom).

Michael's statement on December 26, 2023, that "**3:30 is within the regular daily DTC allocation window**" directly contradicted the statement he made just one day when he declined the "**Learn Alfresco**" training meeting I had scheduled on his calendar.

As you may recall, Michael said the reason for declining the "**Learn Alfresco**" training meeting scheduled for December 28, 2023, at 3:30 PM, was because **3:30 PM** was "**past the DTC cutoff**" (Exhibit 13c). Yet, in his email dated December 26, 2023, Michael stated that "**3:30 is within the regular daily DTC allocation window**" (Exhibit 4b, bottom).

The inconsistency between these two statements is striking. On December 26, Michael indicated that 3:30 PM falls within the regular daily DTC allocation window, implying that there would be no issue completing tasks during that time. However, in his December 27 email, he provided an entirely contradictory explanation for declining the Alfresco training, stating that 3:30 PM was "past the DTC cutoff" and therefore an inappropriate time to train me.

These contradictory statements prove that Michael was selectively using the DTC cutoff time to justify his actions when convenient and discriminate against me. On one hand, he acknowledged that 3:30 PM was within the DTC allocation window when it came to pointing out my supposed mistake and oversight on December 26. On the other hand, he used the exact same time, 3:30 PM, as a reason to decline the Alfresco training meeting I scheduled on his calendar for December 28, claiming it was outside the DTC cutoff and avoiding providing me with training, once again.

This inconsistency further supports my belief that Michael was deliberately making it difficult for me to receive the training I needed and was using technical justifications selectively to deny me the necessary support to perform my job. By contradicting himself in these communications, it is evident that the reasons for denying me training were a tactic to continue withholding vital resources from me, contributing to the broader pattern of racial discrimination and retaliation that led to my wrongful termination.

Furthermore, Michael's refusal to provide me with the training I needed to effectively do my job for 8 months and then assign me to provide coverage for Bill and complete task that Bill was primarily responsible for completing without training or guidance during his vacation instead of assigning someone more seasoned like Sarah or Yesenia kept me in a constant state of darkness and confusion resulting in mistakes that he documented and used to make it appear that I was incompetent and derail my career.

At **12:47** PM I replied, "This is something I will need more practice in. I don't check the dashboard daily as Bill usually does it." Confused and with shattered confidence I continued stating, "**In his absence I did not remember to check it while covering for him.** I will make sure I do this from now on (Exhibit 4b, top)". At **12:53** PM, Michael replied, once again, stating, "**Let's discuss further in our next 1:1. If you are covering for someone on PTO, the expectation is you are fully up to speed on what needs to be done** (Exhibit 4b, top)".

These ongoing contradictions and the constant deferral of training discussions during **one-on-one meetings that never occurred** reflect a broader pattern of discrimination. Michael consistently set

expectations for me without providing the necessary resources or training to meet them, and then used my inability to meet those expectations as a basis for documenting errors and derailing my career. By promising but never delivering the one-on-one meetings to address my training needs, Michael was contributing to a hostile work environment, further exacerbating the racial discrimination and retaliation I continued to experience.

Ultimately, Michael's refusal to follow through on his promises of training and support, coupled with his contradictory statements and actions, made it impossible for me to perform my job effectively. He assigned me tasks outside of my training and knowledge base, especially during Bill's vacation, without providing me the necessary preparation, then documented my errors as if they were a result of incompetence rather than a lack of training. This created a vicious cycle of failure that I could not escape, despite my repeated attempts to seek help, clarification, and support from Michael and others.

Michael's actions are a clear example of how discriminatory and retaliatory behaviors in the workplace can manifest subtly through the withholding of training, support, and resources, while making false promises to address these issues in future meetings that never occur. This most recent incident involving Michael's failure to provide training and his contradictory statements regarding the DTC cutoff time violates the following EEOC regulations.

- **Disparate Treatment in Training and Work Assignments**: Michael consistently failed to provide me with the necessary training to perform my job duties, while he allowed other employees—especially Bill and Yesenia—to be properly trained by Sarah. Despite my requests for help and his promises of one-on-one meetings, Michael denied me the support I needed, which put me at a significant disadvantage compared to my non-Black colleagues. By setting me up to fail through inadequate training and supervision, this amounts to **disparate treatment based on race**, which is prohibited.

- **Selective Enforcement of Expectations**: Michael's contradictory statements about the DTC cutoff time further indicate that he was manipulating the rules when convenient, using them as a tool to deny me the training I requested and keeping me in a constant state of confusion. This selective enforcement was a tactic to deny me an equal opportunity to succeed, creating a racially hostile work environment—also a violation.

- **Retaliation for Requesting Support and Training**: I repeatedly requested training and support from Michael, and instead of receiving assistance, I was met with increased scrutiny, contradictory guidance, and continued promises of training that were never fulfilled. By not following through on these promises and holding me to an impossible standard, Michael was retaliating against me for seeking the tools I needed to perform my job. This is a clear violation of the EEOC's protections against retaliation.

- **Hostile Environment Through Denial of Training and Constant Scrutiny**: Michael's failure to provide training and his creation of a paper trail of errors that I could not have avoided without proper guidance created a hostile and toxic work environment. His refusal to provide me with one-on-one meetings, despite his promises to do so, and his use of email as a tool to document perceived failures without offering constructive feedback, resulted in ongoing workplace stress and isolation. The **EEOC considers such behaviors discriminatory harassment**, and they contribute to the creation of a **racially hostile work environment**.

On December 26, 2023, at 4:23 PM, I continued providing coverage for Bill during his absence and sent an email to the ASAPPROVALS distribution list, copying the P&I dividends distribution list. The email requested approval for a manual entry, stating, "**Please approve this manual entry**" (Exhibit 5a, bottom). I had not received proper training on how to handle these duties independently and relied on the instructions I received from Bill to complete this task.

On December 26, 2023, at 4:47 PM, Michael Marciano responded on behalf of ASAPPROVALS, questioning the quantities I used and the method I employed for the manual entry. He wrote, "**Can you confirm these quantities pls. I thought we established that we should have paid based on RD and then adjust for interim activity on DB Off +1. Should we not do it that way to be consistent? Also, on account 104-10219 the trailer is incorrect—references wrong quantity vs. journal**" (Exhibit 5a, top).

At 4:51 PM on December 26, 2023, I replied to Michael and the distribution list, explaining my reasoning. I wrote, "**I attempted to do it based on RD and it did not balance so Bill stated it should be based on 12/27 and it balanced. However, I can complete it whatever way is best**"

At 4:55 PM on December 26, 2023, Michael responded to all again, pressing further with his concerns. He wrote, "**How did RD not balance? Send me what you're looking at pls. How can you derive 12/27 positions on 12/26? It needs to be paid the correct and consistent way—on payable date, we are supposed to pay holders of record. On DB Off +1, we manually adjust for interim activity**" (Exhibit 5b, top). Michael's insistence on understanding why the RD didn't balance emphasized his frustration, but at that point, I had no formal training on how to handle these issues. Bill's guidance had been the only information I had to rely on, and I lacked the tools and experience to troubleshoot this on my own.

Frustrated, on December 27, 2023, at 6:42 AM, I responded to the email chain, and copied Bill Siano, hoping that he could provide additional context to explain the situation. I wrote, "**...The positions entered did not balance I believe Bill can explain it better. I can make the corrections today**" (Exhibit 5e, top). In this email, I acknowledged that I wasn't sure why the positions didn't balance and expressed my willingness to make the necessary corrections once I had more clarity. By copying Bill, I was seeking further assistance to resolve the issue.

Later that morning, on December 27, 2023, at 8:15 AM, Michael replied directly to me from his personal email account, stating, "**How do RD positions not balance? Are they S/D based? Please ping me this morning so we can review. Do not make any additional entries at this point**" (Exhibit 5e). This response reflected Michael's ongoing frustration with my handling of the task. His directive to stop making any further entries only added to the pressure I felt, as I was unsure how to proceed without additional training or support and he wasn't willing to provide me with any.

At 12:01 PM on December 27, 2023, I replied to Michael and the distribution list, trying to further explain what happened and why I followed Bill's advice. I wrote, "**When I used the RD 12/18, my entitled positions and my entitled dividends were out of balance. I was not sure why it did not balance so I sent it to Bill for a second look. Bill stated that I needed to enter 12/27 as the RD and use those positions and it should be balanced. As a result of his advice, I changed the RD to 12/27, and it balanced. I am still learning the verbiage and I do not want to summarize incorrectly, so I attached the**

original grid I completed and sent to Bill—it shows that I was out of balance, and it has the copy of the screenshots for RD. Please let me know if there was another way to correct this" **(Exhibit 5i)**. At this point, I was attempting to be transparent about my actions and demonstrate that I was trying to learn the proper processes. However, without formal training, I was still unsure about the correct method. My response reflected the confusion I faced and should've prompted Michael to provide me with proper training.

**At 12:41 PM on December 27, 2023**, Michael responded again, stating:

"If you compared the positions you pulled versus the entitled positions in BaNCS (as a starting point), you would have identified the difference as the 2 open trades:

1AA 01846-92 (5)
1BB 89178-92 (3,608)

Further review and reconciliation of these 2 accounts (using BPS activity) would have resulted in these two positions being 0. If you remove these from the grid, it balances.

Twice yesterday, I specifically said that we should have allocated on the payable date using record date positions and then adjust for interim activity on DB Off date. You didn't do this and didn't escalate or ask me that you were doing something other than what I said. How can you change the positions to 12/27 when it was only 12/26? That doesn't make any sense to me, so very curious to understand why it did to you?

The other thing is we started talking about this event at 11:00 AM yesterday but the journals were not submitted for approval until nearly 4:30 PM. This was already an item you missed paying on Friday— there needs to be more urgency and prioritization on your end in processing. We've discussed multiple times that your speed and accuracy need to improve" **(Exhibit 5r)**.

Michael's claim that "Twice yesterday, I specifically said that we should have allocated on the payable date using record date positions and then adjust for interim activity on DB Off date. You didn't do this and didn't escalate or question with me that you were doing something other than what I said," is not only misleading but also contradicts his own enforcement of the chain of command and the support I was provided at the time.

First, it is important to clarify that while Michael may have mentioned his preferred method of allocating on the payable date using record date positions and adjusting for interim activity, the ongoing issue was that I had not been properly trained in these processes. I was never given comprehensive training on how to handle allocations, how to adjust for interim activity on DB Off date, or how to manage the overall task. Bill Siano, who was assigned to train me, did not have the depth of understanding to answer many of my questions, and he often resorted to memorizing steps without explaining the rationale behind them. As a result, when issues like this arose, I was left trying to piece things together without adequate support.

Second, Michael's claim that I didn't escalate the issue is completely contradicted by his own chain of command policy, which he had strictly enforced. I was required to first approach Bill with any job-related questions. If Bill couldn't help, I was allowed to go to Sarah Stone, and only after both Bill and Sarah were unable to assist, could I escalate the issue to Michael himself. On this occasion, I followed that

exact process. Bill, however, didn't fully understand how to resolve the issue, and Sarah also didn't have the answers. As per the chain of command, I was following protocol by trying to resolve the issue through the steps that Michael had imposed.

By the time Michael expected me to escalate directly to him, I was still working through the chain of command as instructed. It's disingenuous for Michael to criticize me for not escalating sooner when I was simply adhering to the procedure he put in place. If Michael had intended for me to come to him directly, that would have required clear instruction from him to bypass the chain of command in specific situations, which was never communicated to me.

Third, the lack of clarity in Michael's communication made it difficult for me to understand that I was allegedly doing something "other than what he said." I sought guidance as best I could be based on the incomplete training and inconsistent feedback I was receiving from Bill and Sarah. If Michael believed I was deviating from his instructions, it would have been more effective to use this as a training opportunity to provide the hands-on guidance that was promised to me but never given.

This entire situation is emblematic of the systemic discrimination and retaliation I was subjected to. Michael set up a structure that made it difficult for me to succeed and then criticized me for not following instructions or escalating issues, despite the barriers he himself had put in place. His allegation that I "didn't escalate" further illustrates how he manipulated situations to build a case against me rather than providing me with the support and training that were necessary to perform my job effectively and that were given to Yesenia beginning on Day 1.

*******

In his email, Michael also stated, "The other thing is we started talking about this event at 11:00 AM yesterday but the journals were not submitted for approval until nearly 4:30 PM. This was already an item you missed paying on Friday—there needs to be more urgency and prioritization on your end in processing. We've discussed multiple times that your speed and accuracy need to improve," is both misleading and dismissive of the larger context surrounding my ability to perform my job.

First, while Michael references a conversation at 11:00 AM, the process of submitting journals for approval involves multiple steps, including gathering the necessary information, performing reconciliations, and verifying data—all of which require access to core systems. I was still struggling to utilize these systems fully due to both limited access and insufficient training. Bill, who was assigned to assist me, also had limited knowledge and experience in explaining the complete process, which left me to rely on fragmented and incomplete instructions.

Additionally, my slowness in completing tasks was not only due to systemic issues like limited access and poor training but was also directly impacted by a work injury I sustained on November 17, 2023. The injury to my hand required me to wear braces, significantly limiting my ability to type, and made it physically difficult for me to perform tasks at my usual pace. I had provided Michael with a doctor's note stipulating that I needed up to 6 hours of breaks per day to manage my condition (Exhibit 43), but instead of making reasonable accommodation, Michael criticized my speed, further adding to the hostile work environment I was already enduring.

Moreover, Michael's allegation that I didn't prioritize the task fails to consider that my slow pace was a direct result of this injury. My reduced speed was not due to a lack of prioritization or urgency but was a direct result of my physical limitations and the lack of appropriate accommodation from management. Michael was aware of my injury and yet continually ignored the impact it had on my ability to perform my duties, instead of using my reduced pace as a reason to criticize my performance unfairly.

Furthermore, Michael's claim that I did not escalate the issue to him contradicts his own directive regarding the chain of command that he had put in place. Michael had explicitly told me that I was required to first go to Bill with any job related questions before escalating them to Sarah Stone, and only after Bill and Sarah couldn't provide an answer was I allowed to approach Michael directly **[Exhibit 5h]**. Given that Bill was assigned as my trainer and was supposed to handle my initial questions, I followed Michael's instructions by seeking Bill's assistance before escalating the issue. Michael's failure to acknowledge this chain of command demonstrates his inconsistency and further highlights the discrimination I was facing. His claim that I "didn't escalate or question" the process when he had limited my ability to directly escalate issues to him is not only contradictory but also misleading.

Additionally, Michael's criticism about the missed payment on Friday ties directly into the contradictory information he provided regarding the DTC cutoff. On December 26, 2023, Michael stated that 3:30 PM was within the regular daily DTC allocation window and implied there should be no issue completing tasks during that time. However, just one day later, on December 27, 2023, he declined my "Learn Alfresco" training meeting, scheduled for 3:30 PM, stating that the meeting was past DTC cutoff time. This inconsistency reveals a pattern where Michael selectively enforced the DTC cutoff to criticize my performance when it suited him, while dismissing it when I attempted to complete tasks during the same timeframe.

His criticism about the missed payment on Friday becomes even more problematic when viewed through this lens. The lack of proper training, coupled with the contradictory guidance on the DTC cutoff time, created confusion and further set me up for failure. Instead of providing clear, consistent instructions or using the missed payment as an opportunity for learning and development, Michael weaponized it to unfairly criticize my performance and continue documenting mistakes that were largely a result of his lack of support and guidance.

This manipulation of the DTC cutoff times and Michael's failure to provide me with consistent information further highlights the discriminatory and retaliatory environment in which I was forced to work.

**On December 27, 2023, I responded at 3:54 PM**, stating:

"…There is very little communication between you and I in the office, Teams or by phone or for several months now. We had only one one-on-one since I have been employed at Wells Fargo. All the one-on-ones were canceled on your part…"

"…when Bill goes on vacation is when I am paid attention to, otherwise neglected by you. I will communicate again that I am not fully trained on my position to cover when Bill leaves. I was told not to stress, that this position takes a while to learn, and it can take two or three years to learn this position.

Our only one-on-one, I expressed that I am completing the work but I don't have an understanding of what I am completing, and you stated that you would teach me..."

"You said, If you compared the positions you pulled versus the entitled positions in BaNCS (as a starting point), you would have identified the difference as the two open trades.' I learned how to do and complete the due bill yesterday by myself as I asked for help from Bill via Teams. You told me that Bill is always my first go-to for questions as he has trained me, and I have done that. Furthermore, I did not realize this was considered an escalation; I believed I was completing the payment the way you asked by staying consistent." **(Exhibit 5d)**

On **December 27, 2023, at 7:19 PM**, Michael responded again, stating:

"I feel compelled to reply here, but I do think a more in-depth face-to-face conversation is in order. I don't intend to cover every single point in this reply, but we'll say the following; there are areas of your performance that need improvement. Most notably are your accuracy, attention to detail, and speed. I have given you this feedback on multiple occasions. We will discuss in greater detail but I note greater than 30 incidences in the last quarter of having to kick back your work due to numerous errors. There are days where your error rate runs at approximately 50%. While unfortunate, I do have to cancel one-on-one meetings with team members as things arise during the course of the day. RCSA, for example, consumes anywhere from 2 to 5 hours per day until next month. Communication is a two-way street. I would expect that if you need something, especially when we are both physically in the office, you get up and walk over to talk to me, or call me over to your desk. If there is something beyond that, I would absolutely expect you to put a meeting on my calendar, or again, pick up the phone or walk over to me and tell me you need some time. I am not aware to this point of any requirements with respect to your finger. However, I would like to see the medical specifics on taking 6 to 12 breaks every hour."

Michael continued, "I do take issue with you saying you are neglected. There have been a significant number of occasions where I have stayed online or in the office to help you through your processing errors/issues. There have been several Friday nights where I have stayed with you until 7:00 PM; there have been numerous nights where I have stayed late with you to complete your work. Again, if you feel there is an issue, I fully expect you to engage me in a conversation. I certainly pay more attention when Bill is on PTO, knowing you need help. For example, last Wednesday I asked you at 10:25 AM via e-mail if you were OK with the Golub DRIP email. I received no reply. I asked again at 5:59 PM if the request was completed, but again received no reply. That same day, on the Main Street Capital DRIP email, I asked if you needed help with it and reiterated if you needed anything, to please ask for it" **(Exhibit 5g)**

In his email, Michael claimed that my accuracy, attention to detail, and speed were areas that needed improvement, and that he had provided me with feedback on multiple occasions. However, the root cause of these issues stems from inadequate training and restricted access to core systems that were essential for my role. Unlike my non-Black peers, including Yesenia Scott, who received direct training from both Michael and Sarah Stone, I was denied the same opportunity. Instead, Michael instructed me to shadow Bill Siano, the least experienced person on our team, who lacked the depth of knowledge necessary to train me effectively. Bill himself admitted that he had memorized the steps of his tasks without fully understanding the reasoning behind them, which limited his ability to provide meaningful guidance. Additionally, my lack of access to core systems exacerbated my challenges. While Yesenia was

granted full access to all relevant systems within two months of starting, my access was delayed and trickled in over several months. This denied me the opportunity to engage directly with the necessary platforms and develop the skills I needed to perform my job efficiently. Without proper training and system access, I was placed at a significant disadvantage, and any errors I made were not due to a lack of competence but rather the result of being set up to fail from the start.

Michael also noted that I had over 30 instances of work being kicked back due to errors in the last quarter and claimed that my error rate ran as high as 50% on some days. However, these errors were often the result of the incomplete or inconsistent instructions I received from Bill and the lack of training I received from Michael. Without proper guidance or access to core systems, I was left to rely on the limited information I was given, leading to mistakes. Rather than using these errors as opportunities for growth and improvement, Michael chose to document them without offering real-time feedback or guidance. It is important to note that Michael communicated these corrections primarily through email, without meeting with me in person to address my mistakes or provide the coaching I needed. This approach not only delayed my ability to correct the errors but also created a paper trail that portrayed me as incompetent. This behavior is a clear reflection of the retaliatory environment I was subjected to, where my mistakes were used as evidence to justify further scrutiny rather than as opportunities for constructive feedback.

In an attempt to justify the recurring cancellation of our one-on-one meetings, Michael stated that "things arise during the day," such as his involvement with RCSA. While it is understandable that certain tasks may require his attention, Michael canceled every single one-on-one meeting he was scheduled to have with me which had a detrimental effect on my performance. These one-on-one meetings were supposed to be an opportunity for me to receive training, receive feedback, ask questions, and address any issues with my work. However, they were never rescheduled, nor were alternative times offered for us to meet. The failure to hold these meetings contradicts Michael's assertion that "communication is a two-way street" and that I should have walked over to his desk or put a meeting on his calendar if I needed assistance. This expectation directly contradicted the chain of command that Michael himself instituted, which required me to go to Bill first for all job-related questions, then to Sarah if Bill couldn't help, and only as a last resort, to Michael. This rigid system left me with limited opportunities to communicate with Michael directly, which was especially problematic given Bill's lack of experience and inability to answer my questions fully. And when I did add the "Learn Alfresco" training meeting to his calendar, he canceled that one, too.

Michael also claimed that he was unaware of the medical accommodations I needed for my injured hand, which required me to take frequent breaks during the day. This is false. I provided Wells Fargo with a doctor's note explaining that I would need to take up to 6 hours of breaks per day due to my injury, which was the result of a fall on company property. Despite being aware of my workers' compensation status and my physical limitations, Michael continued to pressure me to work faster, without regard for my medical needs. His failure to acknowledge my medical condition and accommodate my needs is another example of the discriminatory treatment I endured.

Michael mentioned that he stayed late with me on several occasions to help resolve processing errors and complete my work. While it is true that he remained in the office on some evenings, this was often because he waited until the end of the day to review the work I submitted earlier. On multiple occasions, I submitted my completed assignments in the morning, yet Michael did not review them until just before

the end of my shift, forcing me to stay late to make corrections. This was not a reflection of my inability to complete my work within the regular hours, but rather a tactic used by Michael to document my alleged "slowness" and further create the appearance that I was struggling with my tasks.

Finally, Michael referred to specific emails he sent regarding the Golub DRIP and Main Street Capital DRIP tasks, for which he claims he did not receive a response. The reason he did not receive my responses is that I did not have full access to the P&L group inbox used to communicate about work assignments. When I replied to his emails, my responses were being rejected, and despite informing Michael of this issue, it was never resolved. This technical issue, combined with my lack of access to core systems, further impeded my ability to perform my job effectively and communicate with Michael in the way he expected.

Taken together, the allegations made by Michael Marciano in his email are not only inaccurate but demonstrate a pattern of discriminatory and retaliatory treatment. The errors and delays in my work were largely the result of inadequate training, limited system access, and a lack of guidance from Michael. Rather than offering me the support I needed, Michael chose to document my mistakes and build a case against me, while simultaneously denying me the resources and training provided to my non-Black colleagues. The ongoing cancellation of one-on-one meetings, the failure to address my medical accommodations, and the retaliatory nature of his actions created a hostile work environment where I was set up to fail.

The incidents described violate the following EEOC regulations:

- **Discrimination Based on Race:** I was denied access to core systems, proper training, and resources that were provided to my non-Black peers, including Yesenia Scott, despite being in the same role. This unequal treatment based on race violates the prohibition against racial discrimination under Title VII of the Civil Rights Act of 1964. I was systematically denied opportunities for success, while Yesenia received comprehensive training and access to systems, setting her up for advancement while I was set up for failure.
- **Retaliation:** Michael Marciano's pattern of documenting my mistakes, canceling one-on-one meetings, and refusing to provide training or address my medical accommodations created an environment of retaliation. After I raised concerns about the lack of training and support, Michael's actions became increasingly punitive, demonstrating a clear retaliatory intent. Title VII of the Civil Rights Act of 1964 prohibits retaliation against an employee who raises concerns about discriminatory practices.

- **Failure to Provide Reasonable Accommodations:** After I sustained a workplace injury in November 2023, I provided Wells Fargo with a doctor's note outlining my need for frequent breaks due to the injury. Despite this, Michael refused to accommodate my medical needs, ignored the doctor's note, and continued to pressure me to work faster without regard for my condition.
- **Hostile Work Environment:** Michael's actions, including his failure to provide training, his constant documentation of mistakes, and his refusal to engage in meaningful communication, created a hostile work environment. This environment was characterized by a deliberate effort to undermine my ability to perform my job, leading to mental and emotional distress. Title VII of

the Civil Rights Act of 1964 also prohibits the creation of a hostile work environment based on race or disability.

- **Discrimination Based on Disability:** By denying me reasonable accommodation for my hand injury, failing to acknowledge my medical needs, and pressuring me to perform tasks at a speed that was physically impossible given my condition, Michael engaged in disability discrimination.

On **December 27, 2023**, another obstacle was deliberately placed in my way as I began experiencing access issues that prevented me from getting into the shared folders necessary to perform my job. As part of my daily routine, accessing the **CS folder** was critical for me to complete the tasks assigned to me. However, I found myself locked out of the system, unable to access these essential folders, which severely hindered my ability to work effectively.

Realizing that this was a significant issue, on **December 27, 2023, at 6:55 AM**, I sent an email to **Michael Marciano**, notifying him of the problem. I explained that I wanted to complete a couple of things before heading to my doctor's appointment, but due to the access issue, I couldn't do so. I also stated in the email that I planned to come into the office directly after my doctor's appointment to have my computer checked and hopefully resolve the issue **(Exhibit 6)**. My intent was to show initiative and ensure that the access issue didn't delay my work any further, as I was determined to get back to being productive as soon as possible.

Despite my timely and proactive approach to addressing this problem, I did not receive any response from Michael. His silence was frustrating, especially since this was not an isolated incident. This lack of response was part of an ongoing pattern in which Michael either ignored my legitimate concerns or deliberately withheld assistance that I needed to perform my duties. His refusal to address critical technical issues that directly impacted my ability to complete my work further exacerbated the hostile work environment that I had already been enduring.

The access issue that day was just another in a series of obstacles that continually disrupted my ability to succeed in my role. I was left feeling increasingly isolated, unsupported, and undermined. Michael's failure to respond not only delayed my work but also reinforced the belief that he was intentionally setting me up for failure by withholding the necessary support, making it impossible for me to perform my duties effectively. This created additional stress and anxiety, further contributing to the toxic and discriminatory work environment I was subjected to on a daily basis.

*******

On **December 27, 2023, at 1:09 PM**, I sent an email to Michael Marciano, copying William "Bill" Siano and Sarah Stone, regarding a missing ex-date and record date (RD) for a specific dividend event (ISIN NL0015001586) **(Exhibit 7a)**. The email's subject line was **"RE: [EXTERNAL] RE: Missing Ex-Date & RD-Date [USAM-EMI-133179]"**

In my email, I explained that the situation involved five events, but **four were canceled**, and I was still **waiting to see if funds would be received for the remaining security**. To provide a more thorough explanation, below is a summary of events and actions I included in the email:

1. **Original Allocation of the Event**: The event in question was allocated in BNP under ISIN NL0015001586 on 12/14. Initially, it appeared to be a manufactured event, and it was identified as being part of a **DRIP (Dividend Reinvestment Plan)**.

2. **BNP's Response**: Nauf, a team member, sent a query to BNP, which confirmed that the event was indeed a **DRIP**.

3. **Request for RD and Ex-Date**: Following the confirmation, I sent a query to BNP requesting both the **record date (RD)** and the **ex-date** to proceed further.

4. **BNP's Response**: BNP responded with the **ex-date as 13/11/2023** and the **record date as 14/11/2023**. This provided the required dates to move forward with the event.

5. **Inability to Complete Payment**: When I attempted to complete the payment for this event, nothing was visible on the stock option for the issued dates, creating a roadblock.

6. **Requesting Assistance**: Given the difficulties I was experiencing, I reached out to Michael Marciano for assistance. At this stage, I also noted that the **grid** I had completed did not match the BNP payment.

7. **Next Steps**: Michael requested that I send BNP another query asking whether we would receive funds for the securities to clarify the situation.

8. **BNP's Confusion**: In response to this follow-up, BNP came back stating that they did not see a pending event and therefore could not confirm whether funds would be received.

9. **Providing Further Documentation**: To resolve the situation, I provided Michael with a copy of the grid I had been using to track the event, which also highlighted the discrepancies and steps taken thus far.

10. **Continued Confusion**: BNP later sent back the **MT566 swift**, and after reviewing it, it was evident that the **dates and rates** provided by BNP **did not match the BNP payment**, which contributed to the ongoing issue.

Despite my efforts to resolve the issue, Michael's response was dismissive. He downplayed the complexity of the situation, claiming it only "took 10 minutes to resolve it—after **two weeks** of me going back and forth between several departments to figure out what had gone wrong. This incident is just **one of many attempts to discredit my ability to do my job** and portray that it takes me a long time to complete tasks, implying that I was not escalating issues or asking for help.

In this particular email chain, there was an **error that neither my department nor BNP** could initially understand. I sought help, following the chain of command: First, **I asked Bill**, who couldn't figure out the issue, and then **I asked Sarah**, who also didn't understand the problem. Finally, **I asked Michael**. For almost two weeks, I worked tirelessly, going back and forth with **several departments** to resolve the matter. It wasn't until December 27, 2023, that Michael looked into the situation more seriously and claimed that it only took him **10 minutes** to resolve it.

In my response on **December 27, 2023, at 1:09 PM**, I provided Michael with a **step-by-step summary** of how I handled the issue. I made sure to address the fact that I **had asked Michael for assistance and** had been following his instructions. In the email, I wrote, **"Hi Mike, sure, I will do my best to summarize, and I have attached a copy of the grid with screenshots. Please see below."**

Michael's response further demonstrated his attempts to portray me as incompetent. He questioned why I hadn't completed the task faster, stating that the grids I sent only showed WFB and that he thought I had said there was a WFS piece as well. To clarify, I provided him with a step-by-step summary of the steps I had taken, starting from the original allocation received from BNP on 12/14

In **Step 6** of the summary, I noted that I had asked for assistance, and BNP had responded with incorrect information. This error was not my fault, but rather, it came from another department. Despite this, I continued to follow the process as instructed, escalating the issue when necessary.

After all my efforts, on **December 27, 2023**, Michael claimed it only took him 10 minutes to resolve the problem. However, what he failed to acknowledge was that he himself had instructed me to send the emails to BNP and follow all the steps I had taken. He had asked me to send multiple queries and take extra steps that he now claimed were unnecessary. This was an intentional attempt to make it look like I had mishandled the situation and that it had taken me two weeks to complete something that he could have allegedly resolved in 10 minutes.

Ultimately, the issue was resolved when Michael finally looked into it more closely, determining that the mandatory team had already paid it on 12/7, and the very first answer should have been that it was already paid. Instead, I was made to go through unnecessary steps and be subjected to Michael's ongoing scrutiny and criticism. This was a clear attempt to undermine my work and portray me as inefficient, despite the fact that I followed the instructions I was given and kept meticulous records of every step I took to resolve the matter.

This incident is part of a larger pattern of behavior designed to undermine my work, delay resolution of tasks, and imply that I am incapable of completing assignments in a timely manner. Despite following the instructions provided by Michael, Bill, and Sarah, I was criticized and scrutinized for an issue that should have been resolved much earlier. Michael's claim that it only took him 10 minutes to fix the problem, after asking me to perform multiple unnecessary

steps, demonstrates the retaliatory nature of his actions. He intentionally set me up to fail, creating an environment where I was blamed for delays and errors that were beyond my control. This contributed to the ongoing hostile work environment I experienced and the constant attempts to discredit my ability to perform my job duties.

*******

On **January 2, 2024, at 4:48 PM,** I sent an email to **Michael Marciano** regarding a file titled "010223 - CA457B0T2065.xlsx" **(Exhibit 11a).** The email was a follow-up to a prior exchange where I needed confirmation on the status of the file, which I believed had been an error corrected by Bill. I wrote, "**I believe this was an error that Bill did earlier and corrected.**" My intent was to clarify whether the task had been completed or if additional actions were required on my part.

At **4:54 PM,** Michael responded, stating, "**I think you crossed emails...still waiting for correct file for CA457B0T2065 to be saved for my review**" **(Exhibit 11a).** His response left me somewhat confused, as I was seeking to ensure I had correctly understood his earlier instructions.

At **5:00 PM,** I responded, asking for further clarification. I wrote, "**This one that I asked about earlier this morning is just a claim. You said to take in the money only so there is nothing to put in the grid. Did I understand your reply to my question earlier incorrectly?**" In this message, I wanted to ensure that I had understood Michael's previous instructions accurately and requested that he confirm or clarify the next steps **(Exhibit 11a).**

As illustrated by the email strings contained in the following Exhibits, my employment at Wells Fargo continued to be plagued by discriminatory and retaliatory acts. Michael Marciano was so uninterested in my employment success that he never took any actions towards my development and never entered any goals or development actions in my portal **(Exhibit 32).**

Emailing: 010323-CA00762V1054, 010323
Michael 1/3/24 2:33PM (Exhibit 15a)
Me 1/3/24 2:44PM (Exhibit 15a)
Michael 1/3/24 3:14 PM (Exhibit 15b)
Me 1/3/24 3:37PM (Exhibit 15b)
Michael 1/3/24 3:38PM (Exhibit 15l)
Me 1/3/24 3:39PM (Exhibit 15m)
Me: 1/3/24 4:09PM (Exhibit 15k)
Me 1/3/24 4:33PM (Exhibit 15j)
Michael 1/3/24 5:27PM (Exhibit 15j)
1/4/24 7:27AM (Exhibit 15o)
Michael 1/4/24 7:58 AM (Exhibit 15e, 15e1)
Carlos 1/4/24 8:36 AM (Exhibit (15e, 15e1)
Me 1/4/24 11:12 AM (Exhibit 15f)
Carlos 1/4/24 11:16 AM (Exhibit 15f)

Michael 1/4/24 1:07 PM (Exhibit 15g)
Me 1/4/24 1:10 PM (Exhibit 15g)
Me 1/4/24 3:24 PM (Exhibit 15i)
Carlos 1/4/24 4:24PM (Exhibit 15d)
Me 1/4/24 4:41PM (Exhibit15h)
****

Exhibit 26
Exhibit 27
Exhibit 28
Exhibit 29
Exhibit 30

On January 5, 2024, I contacted HR and filed a formal complaint against Michael, stating that I was experiencing harassment, discrimination, and retaliation **(Exhibit 20)**. After Michael became aware that I had filed a discrimination complaint against him, he retaliated again. First, he made me relocate from my cubicle to Eric's cubicle which was right next to him and Nick Casimir, the other Black employee. This was disturbing on so many levels because the perception made it appear that he was overseeing all the Black employees like a slave master.  Next, he altered the performance review that he completed back in December, to add more negative comments that were not included in the original version completed in December.

I reached out to the Speak Up, Wells Fargo non retaliation hotline via email two different times and did not initially receive a response until a couple of months later. In addition, I reached out to Human Resources, who directed me to Employee Relations, and Annmarie Tournourn was assigned my case. Annamarie encouraged me to take the meeting with Carlos and Michael to see if they would resolve the misconduct. **(Exhibit 21a)** Annamarie agreed to communicate after the meeting to touch base on what was communicated in the meeting.

After communicating with Carlos A. Gomez and Michael Siano in a meeting, Carlos wanted a meeting to further communicate about the emails between Michael and myself to discuss further the harassment and the sabotage of my training, lack of direction, and goals, meetings called one-on-one which was scheduled the same time as Carlos Team Meetings. In addition, as a part of Wells Fargo Performance Management Overview, "Performance Management is an investment in you – an opportunity throughout the year for you to engage with your manager in meaningful conversations that help you perform your very best, Goal settings & Performance Reviews."
**(Exhibit YY** Performance Management Overview)

The performance Management Overview requires Carlos A. Gomez to also have this same one-on-one meeting with Michael Marciano as a part of his Performance Management Overview meeting. Either Carlos was having these meetings with Michael and saw his calendar and agreed with Michael's Misconduct practices or Carlos was not having one-on-ones with Michael at all and was not aware that Michael was not having the one-on-ones himself, and Michael was completing Misconduct equally as Carlos his manager was. "Misconduct is employee or third-party conduct that is unlawful, unethical, or

conflicts with the Company's expectations on ethical and lawful behavior outlined in the Code of Conduct." (**Exhibit WW** Wells Fargo Misconduct)

Annamarie reached out via email and phone call to communicate about the meeting. (**Exhibit** 22a 22b). After communicating the details with Annamarie, I informed her that Michael suggested starting over from scratch, but Carlos wanted me to keep sitting right next to Michael so that he could watch me which means he wants to continue the retaliation of changing my cubical seat that Michael originated. Annamarie suggested that she reach out and speak to Michael Marciano to see what's going on.

After Annmarie spoke to Michael, she called me back and told me that Michael will call me and will be giving me an unfavorable performance review and she is not recommending me to speak to an investigator. I asked Annamarie how he can change my performance review that had a deadline December 31, 2023, in January 2024? I asked her why Michael would go from wanting to start over with a clean slate to speaking with you and now wanting to give me a bad review. In addition, I stated what grounds under Wells Fargo policies and procedures does he have to give me a bad review when I proved that we did not meet beyond our initial introduction. I was never giving any goals or training from Michael. Therefore, there is nothing that he could put on my review to justify any negativity in my review. I informed her that I had only being with the company for 9 months at this time and for the first 3 months I did not have sufficient access to the systems. I also do not have any disciplinary warnings or actions. All the errors in my work are the result of intentionally not wanting to train me or sabotage.

Annamarie said that he could change my review, and he would change my review. I began to explain to Annamarie that although I have only worked for Wells Fargo for nine months, I previously worked for Wells Fargo for about three years, and I was a manager who went through management training, and I also understand that there are no policies and procedures that allow this, and you are aware of it. I informed her that I did not need her consent to contact the speak up line and I had already contacted the speak up line. Annamarie voice was shaky, she stated that she was not aware that I had already reached out to speak up. Annamarie looked up on her computer to see who my Wells Fargo Speak Up investigator was. Furthermore, Annamarie said my investigators' first name and she told me she was going to inform him that I did not need him, and the problem was resolved. Then she quickly got off the phone and I never heard from her again.

I understood that this was blatant retaliation, and Annmari and Michael decided to give me a bad evaluation against the code of conduct standards. Based off Annmarie actions she revealed that the speak upline is not anonymous and she assumed that the investigator had already reached out. But she canceled my speaking case investigation without my permission and before he ever contacted me. Michael contacted me just as she stated and gave me a bad review after the due date. In addition, he used my goals I created a couple months earlier on my review by placing it under the Employee Evaluation Response. Giving the narrative that I responded to the evaluation or was given a chance to add any comments in actuality he added the comments but only informed me that he completed the review and told me I could only view it. Michael manipulated my plan for growth in my review that I completed months back as if he ever reviewed them with me or helped me reach any goals. (**Exhibit VV** My review) (**Exhibit XX** review). However, I never told her I contacted the speak-up line two separate times, and I did not tie both complaints together.

I was contacted by David Walsh Speak up investigator, 01/22/24 Case #754115 I was only able to tell him some of what occurred, and I was not able to provide him with the proof that I needed as I received surgery on my left hand February 2, 2024. David stated that I was under no obligation to speak to him while I was out on workers' compensation as my surgery was a result to a fall at the workplace. He agreed to stay in communication to give me time to get the cast off my hand so that I can show him my evidence. I ended up getting an infection as a result of the surgery and I had has shingles on the right side of my head. The shingles worsened to Postherpetic Neuralgia (PHN) and the nerves in my brain firing off caused memory loss and cognitive issues. I found out that the surgery caused the infection that weakened my immune system which was the cause of the PHN. I expressed to David that I was hospitalized, and I did not feel comfortable speaking with him as I could potentially leave out details because of memory loss and I would need a lot more time. **(Exhibit UU** investigation)

I would be able to speak in small increments at a time as speaking was painful. **(Exhibit TT** emails a little at a time to David) The investigator concluded my cases while out on workers' compensation knowing that he had limited knowledge of my claim. In addition, he knows that I did not have to speak to him at all while I was out. I asked him how he could conclude knowing that you don't have all the information needed. He told me he spoke to Carlos and Michael, and he did not believe that I could prove my case. He told me that my injury occurred at work in December so when my seat was moved it was before fall. I explained that I fell at work in November and that's in the records I am not sure how you could investigate and not find that to be incorrect. He told me that he could see every email I copied myself on or forwarded to myself and that I could not prove anything I was saying. I let him know that I could prove everything I just need time to heal, and time should be automatic as I am out of work injured. David agreed to reopen the case based on the incorrect timeline of the injury. **(Exhibit SS** he reopened the case)

I no longer trusted David as he lied and said he could wait, and I did not have to participate until I was back at work. Then he said he concluded based on his understanding on what I could prove all while not looking into a major fact the date of my fall. He was several weeks off. However, I could no longer speak to him any longer. Wells Fargo and Sedgwick, the worker's compensation company, both came together and sued me. I was informed by my Sedgwick case manager and her boss. I reached out to David Walsh and informed him I was no longer able to communicate as I was being sued by my employer while the investigation was supposedly reopened. I would now need an attorney and could no longer discuss this information. **(Exhibit WW** Email from Case manager with David copied on it)

I received the lawsuit from Wells Fargo and Sedgwick concerning the workers' compensation injury. The injury was part of my initial complaint of discrimination retaliation and unfair treatment. **(Exhibit RR** Lawsuit)

Wells Fargo was aware of my medical condition as I was asked to sign the medical release paper of my 7-day hospital stay and my continued treatment. Wells Fargo was aware of my memory loss and cognitive issues concerning the complications from my worker's compensation surgery. As a result, they filed a lawsuit in direct retaliation. **(Exhibit QQ** Medical Release form)

After getting an attorney and protecting myself from my employer and Sedwick. I was able to involve the EEOC. Three weeks after Wells Fargo received notice from the EEOC On August 20, 2024, I received a phone call from Carlos A. Gomez Executive Director, Head of Asset Services, stating that my position was eliminated, and I would be paid out for 60 days. Notably, mine was the only position that was eliminated. The retaliation was in concluding the investigation while I was out, next stating it would be reopened knowing there was no fair investigation and fact checks. Then the lawsuit for my worker's compensation case and finally, eliminating my position. I worked only three weeks the entire year, I proved I was not trained by my manager, and he was purposely not meeting with me, I could prove he was changing my work and purposely waiting to the last minutes of the day to approve my work just to say it was incorrect and it was correct. Changing my work every time I submitted it to show errors and inconsistencies. However, my position was said to be eliminated but they actually gave it to another employee in Wells Fargo at a different location managed under Carlos A. Gomez. (**Exhibit PP** letter from eliminating my position & Response to eliminating my position). There is another position with the same title in the same city and state opened. After realizing they eliminated my job the verbiage was changed to eliminating position while keeping me employed. Attempting to force e to sign a severance that says I cant except any payment from my lawsuit even the one they filed against me. In hopes that I will be forced to take the money after eliminating my position and my workers compensation is over. I denied the two-month severance and they sent me a job opening of the exact position title in the same city and state. However, I received no communication after applying for a job I already had. (**EXHIBIT OO** job opening email.)


**Retaliation for Engaging in Protected Activity:**
- Wells Fargo Violated their Speak Up nonretaliation policy by stating that it's anonymous. By submitting a lawsuit in the midst of the ongoing investigation.
  Wells Fargo also violated their Affirmative Action policy by Eliminating my position and not doing everything they could to maintain my position or giving me an equal position. Wells Fargo sent me a severance package and only pay me for only two months if I agreed to not receive any compensation for any legal case with Wells Fargo regardless of if the case is already open or any future case. I denied the severance Wells Fargo is bullying me after violating laws and their policies, procedures and code of conduct. By offering me an unfair severance package to get rid of me and not be accountable for their actions. After I turned down the unfair severance package, I applied for the exact same position title that I was eliminated from in the same city and state in another department. I informed the team that I applied for the position. (**Exhibit NN** position email and email stating I applied) Wells Fargo is intentionally not giving me my position back violating the affirmative action guidelines. (**Exhibit MM Affirmative** Action Policy)

**Disability Discrimination and Failure to Accommodate:**
- Wells Fargo failure to accommodate my medical condition following my workplace injury, despite my doctor's note stating that I could not go back to work because of the side effects to my hand surgery, further violates the Americans with Disabilities Act (ADA). The ADA requires employers to provide reasonable accommodation to employees with disabilities, and Wells Fargo is in violation of these regulations.

**Affirmative Action Violation**:

- Wells Fargo did not consider Priscilla M. Cannion for the position in question after applying for it, I am being overlooked for internal opportunities, especially when I am eligible and capable for the role.

01/31/2025